**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.

AUDEMARS PIGUET HOLDING SA,
BREITLING U.S.A., INC.,
CHOPARD (USA), LTD,
HENRI STERN WATCH AGENCY, INC.,
LVMH SWISS MANUFACTURES, S.A.,
HERMÈS INTERNATIONAL, and
OMEGA SA,

              Plaintiffs,

vs.

THE INDIVIDUALS, PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A" and
DOES 1-10,

              Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Audemars Piguet Holding SA, Breitling U.S.A., Inc., Chopard (USA), Ltd.,

Henri Stern Watch Agency, Inc., Hermès International, LVMH Swiss Manufactures, S.A., and

Omega SA, (collectively "Plaintiffs")[1], hereby sue Defendants, the Individuals, Partnerships and

Unincorporated Associations identified on Schedule "A" hereto and Does 1-10 (collectively

"Defendants"). Defendants are promoting, selling, offering for sale and/or distributing goods

---

[1] Each Plaintiff is a member of the Federation of the Swiss Watch Industry FH, a non-profit trade association with over 500 members, representing more than 90% of all Swiss watch manufacturers, which was founded in 1924 to contribute to the protection and development of the Swiss Watch Industry. In 1999, members of the Federation of the Swiss Watch Industry FH, including Plaintiffs', established the Anti-Counterfeiting Group, which was created to combat common sources of counterfeit goods which cause harm to its members' respective brands individually and to the Swiss watch industry in its entirety, which results in further harm to each member's brand. Since 1999, the Federation of the Swiss Watch Industry FH, through its anti-counterfeiting division, has worked with international law enforcement and government agencies to conduct raids and investigations of counterfeit operations, as well as raise public awareness regarding the issue.

bearing counterfeits and confusingly similar imitations of Plaintiffs' respective trademarks within this district through various Internet based e-commerce stores using the seller identities set forth on Schedule "A" hereto (the "Seller IDs"). In support of their claims, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      This is an action for federal trademark counterfeiting and infringement, false designation of origin, and common law unfair competition pursuant to 15 U.S.C. §§ 1114, 1116, 1121, and 1125(a) and The All Writs Act, 28 U.S.C. § 1651(a). Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claim because that claim is so related to the federal claims that it forms part of the same case or controversy.

2.      Defendants are subject to personal jurisdiction in this district because they direct business activities toward and conduct business with consumers within the State of Florida and this district through at least the Internet based e-commerce stores under their Seller IDs.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, engaged in infringing activities and causing harm within this district by advertising, offering to sell, and/or selling infringing products into this district.

## THE PLAINTIFFS

4.      Plaintiff Audemars Piguet Holding SA (Audemars Piguet) is a societe anonyme organized under the laws of Switzerland, having its principal office at Route de France 16, CH-1348 Le Brassus, Switzerland.

5.      Plaintiff Breitling U.S.A., Inc. ("Breitling USA") is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in the United States located at 206 Danbury Road Hangar 7, Wilton, Connecticut 06897.

6.      Plaintiff Chopard (USA), Ltd. ("Chopard USA") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the United States located at 21 East 63rd Street, New York, New York 10021.

7.      Plaintiff Henri Stern Watch Agency, Inc.  ("Henri Stern") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the United States located at One Rockefeller Plaza, New York, New York 10020.

8.      Plaintiff Hermès International ("Hermès") is a corporation organized and existing under the laws of France with its principal place of business located at 24 Rue Du Faubourg Saint-Honore, Paris, France 75008.

9.      Plaintiff LVMH Swiss Manufactures, S.A. ("LVMH") is a societe anonyme organized under the laws of Switzerland with a principal place of business at 6A, Rue Louis-Joseph Chevrolet, CH- 2300 La Chaux-de-Fonds, Switzerland.

10.      Plaintiff Omega SA ("Omega") is a societe anonyme organized under the laws of Switzerland with its principal place of business located at 96 rue Jakob Stampfli, Bienne, Switzerland.

11.      Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their respective trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' individual trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits. The natural and intended byproduct of Defendants' actions is

the erosion and destruction of the goodwill associated with Plaintiffs' respective famous names and trademarks and the destruction of the legitimate market sector in which they operate.

12.     In order to combat the indivisible harm caused by the combined actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant amounts of money in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement such as field training guides and seminars. The recent explosion of counterfeiting over the Internet has created an environment which requires companies such as Plaintiffs to file a large number of lawsuits, often it later turns out, against the same individuals and groups, in order to protect both consumers and themselves from the ill effects of confusion and the erosion of the goodwill connected to Plaintiffs' respective brands.

## THE DEFENDANTS

13.     Defendants are individuals and/or business entities of unknown makeup, each of whom, upon information and belief, either reside and/or operate in other foreign jurisdictions, including the People's Republic of China or redistribute products from sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b). Defendants target their business activities towards consumers throughout the United States, including within this district through the operation of, at least, one fully interactive commercial Internet based e-commerce store existing under the Seller IDs.

14.     Plaintiffs are presently unaware of the true names of Does 1-10, although they are generally identified as the managing agents and/or co-conspirators of the Defendant.  Plaintiffs will amend this Complaint upon discovery of the identities of such fictitious Defendants.

15.     Defendants are the past and present controlling forces behind the sale of counterfeit and infringing products bearing Plaintiffs' individual trademarks as described herein using at least the Seller IDs.

16.     Upon information and belief, Defendants directly engage in unfair competition with Plaintiffs by advertising, offering for sale, and selling goods bearing counterfeits and infringements of one or more of Plaintiffs' individual trademarks to consumers within the United States and this district through Internet based e-commerce stores using, at least, the Seller IDs and additional names or seller identification aliases not yet known to Plaintiffs. Defendants have purposefully directed some portion of their illegal activities towards consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit branded goods into the State.

17.     Defendants have registered, established or purchased, and maintained the Seller IDs.  Upon information and belief, Defendants have engaged in fraudulent conduct with respect to the registration of the Seller IDs by providing misleading information to the Internet based e-commerce stores where they sell during the registration or maintenance process. Upon information and belief, Defendants have anonymously registered and maintained some of the Seller IDs for the sole purpose of engaging in illegal counterfeiting activities.

18.     Upon information and belief, Defendants will continue to register or acquire new seller identification aliases for the purpose of selling and offering for sale goods bearing counterfeit and confusingly similar imitations of Plaintiffs' respective trademarks unless preliminarily and permanently enjoined.

19.     Defendants' Internet-based businesses amount to nothing more than illegal operations established and operated in order to infringe the intellectual property rights of Plaintiffs and others.

20.     Defendants' business names, i.e., the Seller IDs, and any other alias seller identification names used in connection with the sale of counterfeit and infringing goods bearing Plaintiffs' respective trademarks are essential components of Defendants' online activities and are one of the means by which Defendants further their counterfeiting and infringing scheme and cause harm to Plaintiffs.  Moreover, Defendants are using Plaintiffs' respective famous names and trademarks to drive Internet consumer traffic to their e-commerce stores operating under the Seller IDs, thereby increasing the value of the Seller IDs and decreasing the size and value of Plaintiffs' legitimate common marketplace at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Audemars Piguet's Trademark Rights

21.     Audemars Piguet is the owner of the following trademark registered on the Principal Register of the United States Patent and Trademark Office (the "AUDEMARS PIGUET Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| AUDEMARS PIGUET | 1,591,934 | April 17, 1990 | IC 014 - watches, clocks, stop watches, time recorders, chronometers, chronographs, watch movements, and parts of all the foregoing. |

The AUDEMARS PIGUET Mark is used in connection with the manufacture and distribution of high quality goods in the categories identified above.

22.     The AUDEMARS PIGUET Mark has been used in interstate commerce to identify and distinguish Audemars Piguet and related companies' high quality goods for an extended period of time and serves as a symbol of Audemars Piguet's quality, reputation and goodwill.

23.     Further, Audemars Piguet and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the AUDEMARS PIGUET Mark. Audemars Piguet and related companies have spent millions of dollars to extensively advertise and promote products under the AUDEMARS PIGUET Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Audemars Piguet website, www.audemarspiguet.com. The AUDEMARS PIGUET Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

24.     Audemars Piguet and related companies have extensively used, advertised and promoted the AUDEMARS PIGUET Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the AUDEMARS PIGUET Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

25.     Audemars Piguet has carefully monitored and policed the use of the AUDEMARS PIGUET Mark and has never assigned or licensed the AUDEMARS PIGUET Mark to any of the Defendants in this matter.

26.     Genuine goods bearing the AUDEMARS PIGUET Mark are widely legitimately advertised and promoted by Audemars Piguet and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become

7

increasingly important to Audemars Piguet's overall marketing and consumer education efforts.

Thus, Audemars Piguet and related companies expend significant monetary resources on Internet

marketing and consumer education, including search engine optimization ("SEO") strategies.

Those strategies allow Audemars Piguet and its authorized retailers to fairly and legitimately

educate consumers about the value associated with the AUDEMARS PIGUET Mark and the

goods sold thereunder.

**Breitling USA's Trademark Rights**

27.    Breitling USA is the owner of the following trademark registered on the Principal

Register of the United States Patent and Trademark Office (the "BREITLING Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| BREITLING | 2,964,474 | July 5, 2005 | IC 014 - horological instruments and chronometrical instruments, namely, watches, wrist-watches straps for wrist-watches, watchcases, clocks, chronographs, chronometers, and parts thereof. <br><br> IC 025 - caps, scarves t-shirts, shirts, sweatshirts, polo shirts, jackets, pilot jackets, bomber's jackets, parka jackets. |

The BREITLING Mark is used in connection with the manufacture and distribution of high

quality goods in the categories identified above.

28.    The BREITLING Mark has been used in interstate commerce to identify and

distinguish Breitling USA's high quality goods for an extended period of time and serves as a

symbol of Breitling USA's quality, reputation and goodwill.

29.    Further, Breitling USA and related companies have expended substantial time,

money and other resources developing, advertising and otherwise promoting the BREITLING

Mark. Breitling USA and related companies have spent millions of dollars to extensively advertise and promote products under the BREITLING Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Breitling website, www.breitling.com. The BREITLING Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

30.     Breitling USA has extensively used, advertised and promoted the BREITLING Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the BREITLING Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

31.     Breitling USA has carefully monitored and policed the use of the BREITLING Mark and has never assigned or licensed the BREITLING Mark to any of the Defendants in this matter.

32.     Genuine goods bearing the BREITLING Mark are widely legitimately advertised and promoted by Breitling USA and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Breitling USA's overall marketing and consumer education efforts. Thus, Breitling USA and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Breitling USA and its authorized retailers to fairly and legitimately educate consumers about the value associated with the BREITLING Mark and the goods sold thereunder.

9

**Chopard USA's Trademark Rights**

33.     Chopard USA is the owner of the following trademark registered on the Principal

Register of the United States Patent and Trademark Office (the "CHOPARD Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| CHOPARD | 1,877,546 | February 7, 1995 | IC 014 - horological products; namely, watches, watch movements, watch cases, watch dials and parts of watches; genuine jewelry; namely, rings, bracelets, necklaces, pendants, earrings, cuff links, tie pins and key holders made in whole or in part of precious metal. |

The CHOPARD Mark is used in connection with the manufacture and distribution of high

quality goods in the category identified above.

34.     The CHOPARD Mark and related companies have been used in interstate

commerce to identify and distinguish Chopard USA's high quality goods for an extended period

of time and serves as a symbol of Chopard USA's quality, reputation and goodwill.

35.     Further, Chopard USA has expended substantial time, money and other resources

developing, advertising and otherwise promoting the CHOPARD Mark.  Chopard USA and

related companies have spent millions of dollars to extensively advertise and promote products

under the CHOPARD Mark in magazines, newspapers, on the Internet and in other media

worldwide, including the official Chopard website, www.chopard.com. The CHOPARD Mark

qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

36.     Chopard USA has extensively used, advertised and promoted the CHOPARD

Mark in the United States in connection with the sale of high quality watches and related goods.

As a result, the CHOPARD Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

37.     Chopard USA has carefully monitored and policed the use of the CHOPARD Mark and has never assigned or licensed the CHOPARD Mark to any of the Defendants in this matter.

38.     Genuine goods bearing the CHOPARD Mark are widely legitimately advertised and promoted by Chopard USA and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Chopard USA's overall marketing and consumer education efforts. Thus, Chopard USA and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Chopard USA and its authorized retailers to fairly and legitimately educate consumers about the value associated with the CHOPARD Mark and the goods sold thereunder.

**Henri Stern's Trademark Rights**

39.     Henri Stern is the owner of the following trademark registered on the Principal Register of the United States Patent and Trademark Office (the "PATEK PHILIPPE Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| PATEK PHILIPPE | 520,291 | January 24, 1950 | IC 014 - watches. |

The PATEK PHILIPPE Mark is used in connection with the manufacture and distribution of high quality goods in the category identified above.

40.     The PATEK PHILIPPE Mark has been used in interstate commerce to identify and distinguish Henri Stern's high quality goods for an extended period of time and serves as a symbol of Henri Stern's quality, reputation and goodwill.

41.     Further, Henri Stern and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the PATEK PHILIPPE Mark.  Henri Stern and related companies have spent millions of dollars to extensively advertise and promote products under the PATEK PHILIPPE Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Patek Philippe website, www.patekphilippe.com. The PATEK PHILIPPE Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

42.     Henri Stern has extensively used, advertised and promoted the PATEK PHILIPPE Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the PATEK PHILIPPE Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

43.     Henri Stern has carefully monitored and policed the use of the PATEK PHILIPPE Mark and has never assigned or licensed the PATEK PHILIPPE Mark to any of the Defendants in this matter.

44.     Genuine goods bearing the PATEK PHILIPPE Mark are widely legitimately advertised and promoted by Henri Stern and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Henri Stern's overall marketing and consumer education

12

efforts. Thus, Henri Stern and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Henri Stern and its authorized retailers to fairly and legitimately educate consumers about the value associated with the PATEK PHILIPPE Mark and the goods sold thereunder.

**Hermès' Trademark Rights**

45.    Hermès is the owner of the following trademark registered on the Principal Register of the United States Patent and Trademark Office (the "HERMÈS Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| HERMES | 369,271 | July 18, 1939 | IC 014 - clocks and watches. |

The HERMÈS Mark is used in connection with the manufacture and distribution of high quality goods in the category identified above.

46.    The HERMÈS Mark has been used in interstate commerce to identify and distinguish Hermès' high quality goods for an extended period of time and serves as a symbol of Hermès' quality, reputation and goodwill.

47.    Further, Hermès and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the HERMÈS Mark. Hermès and related companies have spent millions of dollars to extensively advertise and promote products under the HERMÈS Mark in magazines, newspapers, in stores, on the Internet and in other media worldwide, including the official Hermès website, www.hermes.com. The HERMÈS Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

48.    Hermès has extensively used, advertised and promoted the HERMÈS Mark in the United States in connection with the sale of high quality watches and related goods. As a result,

the HERMÈS Mark is among the most widely recognized trademarks in the United States, and

the trademark has achieved secondary meaning as an identifier of high quality goods.

49.     Hermès has carefully monitored and policed the use of the HERMÈS Mark and

has never assigned or licensed the HERMÈS Mark to any of the Defendants in this matter.

50.     Genuine goods bearing the HERMÈS Mark are widely legitimately advertised and

promoted by Hermès and related companies, authorized distributors and unrelated third parties

via the Internet.  Over the course of the past five to seven years, visibility on the Internet,

particularly via Internet search engines such as Google, Yahoo!, and Bing has become

increasingly important to Hermès' overall marketing and consumer education efforts. Thus,

Hermès and related companies expend significant monetary resources on Internet marketing and

consumer education, including SEO strategies. Those strategies allow Hermès and its authorized

retailers to fairly and legitimately educate consumers about the value associated with the

HERMÈS Mark and the goods sold thereunder

**LVMH's Trademark Rights**

51.     LVMH is the owner of the following trademark registered on the Principal

Register of the United States Patent and Trademark Office (the "TAG HEUER Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| TAG HEUER | 2,281,436 | September 28, 1999 | IC 014 - Clocks, watches and parts thereof. |

The TAG HEUER Mark is used in connection with the manufacture and distribution of high

quality goods in the category identified above.

52.     The TAG HEUER Mark has been used in interstate commerce to identify and distinguish LVMH's high quality goods for an extended period of time and serves as a symbol of LVMH's quality, reputation and goodwill.

53.     Further, LVMH and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the TAG HEUER Mark. LVMH and related companies have spent millions of dollars to extensively advertise and promote products under the TAG HEUER Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official TAG HEUER website, www.tagheuer.com. The TAG HEUER Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

54.     LVMH has extensively used, advertised and promoted the TAG HEUER Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the TAG HEUER Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

55.     LVMH has carefully monitored and policed the use of the TAG HEUER Mark and has never assigned or licensed the TAG HEUER Mark to any of the Defendants in this matter.

56.     Genuine goods bearing the TAG HEUER Mark are widely legitimately advertised and promoted by LVMH and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to LVMH's overall marketing and consumer education efforts. Thus, LVMH and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow LVMH and its authorized

retailers to fairly and legitimately educate consumers about the value associated with the TAG HEUER Mark and the goods sold thereunder.

**Omega's Trademark Rights**

57.     Omega is the owner of the following trademark registered on the Principal Register of the United States Patent and Trademark Office (the "OMEGA Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| **OMEGA** | 566,370 | November 4, 1952 | IC 014 - watches and parts thereof. |

The OMEGA Mark is used in connection with the manufacture and distribution of high quality goods in the category identified above.

58.     The OMEGA Mark and related companies have been used in interstate commerce to identify and distinguish Omega's high quality goods for an extended period of time and serves as a symbol of Omega's quality, reputation and goodwill.

59.     Further, Omega has expended substantial time, money and other resources developing, advertising and otherwise promoting the OMEGA Mark.  Omega and related companies have spent millions of dollars to extensively advertise and promote products under the OMEGA Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Omega website, www.omegawatches.com. The OMEGA Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

60.     Omega has extensively used, advertised and promoted the OMEGA Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the OMEGA Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

16

61.     Omega has carefully monitored and policed the use of the OMEGA Mark and has never assigned or licensed the OMEGA Mark to any of the Defendants in this matter.

62.     Genuine goods bearing the OMEGA Mark are widely legitimately advertised and promoted by Omega and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Omega's overall marketing and consumer education efforts. Thus, Omega and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Omega and its authorized retailers to fairly and legitimately educate consumers about the value associated with the OMEGA Mark and the goods sold thereunder.

### Defendants' Infringing Activities

63.     Upon information and belief, Defendants are promoting and advertising, distributing, selling and/or offering for sale at least watches bearing counterfeit and infringing trademarks that are exact copies of the AUDEMARS PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark (the "Counterfeit Goods") via an Internet based marketplace website through at least the Internet e-commerce stores operating under the Seller IDs.  Specifically, upon information and belief, Defendants are using identical copies of the AUDEMARS PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark (collectively, "Plaintiffs' Marks") for different quality goods.  Plaintiffs have used their respective Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' goods.

64.     Upon information and belief, Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' respective, genuine goods.  Defendants, upon information and belief, are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for the genuine quality goods offered for sale by Plaintiffs despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks.  The net effect of Defendants' actions will cause confusion of consumers who will believe Defendants' Counterfeit Goods are genuine goods originating from, associated with, and approved by Plaintiffs.

65.     Defendants advertise their Counterfeit Goods for sale to the consuming public via e-commerce stores on an Internet marketplace website using at least the Seller IDs.  In so advertising these goods, Defendants use Plaintiffs' Marks without Plaintiffs' permission. The misappropriation of Plaintiffs' advertising ideas in the form of Plaintiffs' Marks is the proximate cause of damage to Plaintiffs.

66.     As part of their overall infringement and counterfeiting scheme, Defendants are, upon information and belief, all employing substantially similar, paid advertising and marketing strategies based, in large measure, upon an illegal use of counterfeits and infringements of Plaintiffs' Marks. Specifically, Defendants are using counterfeits of Plaintiffs' Marks in order to make their e-commerce stores selling illegal goods appear more relevant and attractive to consumers online. By their actions, Defendants have created an illegal marketplace operating in parallel to the legitimate marketplace for Plaintiffs' respective goods. Defendants are causing concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs of their right to fairly compete for space within search engine results and reducing the visibility

of Plaintiffs' genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, and (iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet.

67.     Upon information and belief, Defendants are concurrently targeting their counterfeiting and infringing activities toward consumers and causing harm within this district and elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

68.     Upon information and belief, at all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their respective, exclusive rights to use and license such intellectual property and the goodwill associated therewith.

69.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

70.     Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' respective goodwill and reputations.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

71.     Defendants' above identified infringing activities are likely to cause confusion, deception and mistake in the minds of consumers, the public, and the trade before, during, and after the time of purchase.  Moreover, Defendants' wrongful conduct is likely to create a false

impression and deceive customers, the public, and the trade into believing there is a connection or association between Plaintiffs' respective genuine goods and Defendants' Counterfeit Goods, which there is not.

72.     Plaintiffs have no adequate remedy at law.

73.     Plaintiffs are suffering irreparable and indivisible injury and have suffered substantial damages as a result of Defendants' unauthorized and wrongful use of Plaintiffs' Marks. If Defendants' counterfeiting, infringing and unfairly competitive activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

74.     The harm and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods.

## COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

75.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 74 above.

76.     This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale, and sale of the Counterfeit Goods.

77.     Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing at least watches, using counterfeits and/or infringements of Plaintiffs' Marks. Defendants are continuously infringing and inducing others to infringe Plaintiffs' Marks by using them to advertise, promote and sell counterfeit and infringing watches.

78.     Defendants' indivisible, concurrent counterfeiting and infringing activities are likely to cause and actually are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

79.     Defendants' unlawful actions have individually and jointly caused and are continuing to cause unquantifiable damages to Plaintiffs and are unjustly enriching Defendants at Plaintiffs' expense.

80.     Defendants' above-described illegal actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' respective rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

81.     Plaintiffs have each suffered and will continue to suffer irreparable injury due to Defendants' above described activities if Defendants are not preliminarily and permanently enjoined.

## COUNT II - FALSE DESIGNATION OF ORIGIN
## PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

82.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 74 above.

83.     Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of Plaintiffs' Marks have been widely advertised via at least one Internet marketplace website.

84.     Defendants' Counterfeit Goods bearing, offered for sale and sold using copies of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' respective, genuine goods. However, Defendants' Counterfeit Goods are different and likely inferior in quality. Accordingly, Defendants' activities are likely to cause confusion in the trade and among the general public as to at least the origin or sponsorship of their Counterfeit Goods.

85.     Defendants, upon information and belief, have used in connection with their sale of the Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and trade dress which tend to falsely describe or represent such goods and have caused such goods to enter into commerce with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

86.     Defendants have authorized infringing uses of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods.  Defendants have misrepresented to members of the consuming public that the Counterfeit Goods being advertised and sold by them are genuine, non-infringing goods.

87.     Additionally, Defendants are using counterfeits and infringements of Plaintiffs' Marks in order to unfairly compete with Plaintiffs and others for space within search engine organic results, thereby jointly depriving Plaintiffs of a valuable marketing and educational tool which would otherwise be available to Plaintiffs and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web.

88.     Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

89.     Plaintiffs have no adequate remedy at law, and have each sustained indivisible injury and damage caused by Defendants' concurrent conduct. Absent an entry of an injunction by this Court, each Plaintiff will continue to suffer irreparable injury to their respective goodwill and business reputations, as well as monetary damages.

**COUNT III - COMMON LAW UNFAIR COMPETITION**

90.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 74 above.

91.     This is an action against Defendants based on their promotion, advertisement, distribution, sale, and/or offering for sale of goods bearing marks that are virtually identical, both visually and phonetically, to Plaintiffs' Marks in violation of Florida's common law of unfair competition.

92.     Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing watches and related goods bearing counterfeits and infringements of Plaintiffs' Marks. Defendants are also using counterfeits and infringements of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (1) space in search engine results across an array of search terms and (2) visibility on the World Wide Web.

93.     Defendants' infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' products by their use of Plaintiffs' Marks.

94.     Plaintiffs have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions.

## PRAYER FOR RELIEF

95.     WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief, jointly and severally, against Defendants as follows:

a.     Entry of temporary, preliminary and permanent injunctions pursuant to Federal Rule Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting the AUDEMARS

PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark, or any mark or trade dress similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name or trademark or trade dress that may be calculated to falsely advertise the services or goods of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants are in any way endorsed by, approved by, and/or associated with Plaintiffs; from infringing, counterfeiting, or diluting the AUDEMARS PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark; from using any reproduction, counterfeit, copy, or colorable imitation of the AUDEMARS PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark in connection with the publicity, promotion, sale, or advertising of any goods sold by Defendants, including, without limitation, watches; from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs and from offering such goods in commerce; from engaging in search engine optimization strategies using colorable imitations of Plaintiffs' respective name or trademarks; and from otherwise unfairly competing with Plaintiffs.

b.      Entry of an order requiring the Seller IDs, and any other alias seller identification names being used by Defendants to engage in the business of marketing, offering

24

to sell, and/or selling goods bearing counterfeits and infringements of the AUDEMARS PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark be disabled by the applicable governing Internet marketplace website.

c.      Entry of an order that, upon Plaintiffs' request, any Internet marketplace website administrators that are provided with notice of the injunction, cease facilitating access to any or all e-commerce stores through which Defendants engage in the promotion, offering for sale, and/or sale of goods bearing counterfeits and/or infringements of the AUDEMARS PIGUET Mark, BREITLING Mark, CHOPARD Mark, PATEK PHILIPPE Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark.

d.      Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits and damages resulting from Defendants' trademark counterfeiting and infringing activities and that the award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or, at Plaintiffs' election with respect to Count I, that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

e.      Entry of an award of Plaintiffs' costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

f.      Entry of an order requiring all funds, including any funds restrained, up to and including the total amount of judgment, in payment accounts or money transfer systems used in connection with the Seller IDs or other alias seller identification or e-commerce store names used by the Defendants presently or in the future, including PayPal, Inc., and any other financial

institution, bank, and/or payment processing accounts, to be surrendered to Plaintiffs in partial

satisfaction of the monetary judgment entered herein.

        g.     Entry of an award of pre-judgment interest on the judgment amount.

        h.     Entry of an Order for any further relief as the Court may deem just and

proper.

DATED: April 22, 2015.          Respectfully submitted,

          STEPHEN M. GAFFIGAN, P.A.

          By: **s:/Stephen M. Gaffigan**/_____
          Stephen M. Gaffigan (Fla. Bar No. 025844)
          Virgilio Gigante (Fla. Bar No. 082635)
          T. Raquel Rodriguez-Albizu (Fla. Bar. No. 103372)
          401 East Las Olas Blvd., #130-453
          Ft. Lauderdale, Florida 33301
          Telephone: (954) 767-4819
          Facsimile: (954) 767-4821
          E-mail: stephen@smgpa.net
          E-mail: leo@smgpa.net
          E-mail: raquel@smgpa.net

          Attorneys for Plaintiffs

## SCHEDULE "A"
## DEFENDANTS BY NUMBER AND SELLER IDs

| Defendant Number | Defendant / Seller ID |
|---|---|
| 1 | chinaone886 |
| 2 | huihuang188 |
| 3 | 00796qianlaile |
| 4 | a1069816 |
| 5 | aozhou585 |
| 6 | asdfasdf011 |
| 7 | asdfg237 |
| 7 | bhujm985 |
| 7 | njikm9966 |
| 7 | vgyhn1980 |
| 7 | zhuang99 |
| 7 | zsedc3698 |
| 8 | birthdaygift888 |
| 9 | boluomi576 |
| 10 | brandbags588 |
| 11 | btalk |
| 12 | btimes |
| 12 | jayz169 |
| 12 | koobe1 |
| 12 | lanvin01 |
| 13 | caijing588 |
| 14 | california999 |
| 15 | cfo2015 |
| 16 | chenggong568 |
| 17 | chongguo5288 |
| 17 | fengyehongla368 |
| 17 | mingtianhuigenhao158 |
| 18 | chunmanyuan |
| 19 | comemoney2014 |
| 19 | kouxiangtang311 |
| 20 | contract889 |
| 21 | cooseller |
| 22 | csss9855 |
| 23 | damaijia88 |
| 24 | defender66 |
| 25 | dianzishangwu2014c2c |
| 26 | doujiaowolaoda888 |
| 26 | nizhuaisha8899 |

| | |
|---|---|
| 26 | onthebeach111 |
| 26 | shan98 |
| 27 | esford |
| 28 | fashion2016 |
| 29 | fushui520 |
| 30 | gogo009 |
| 30 | high009 |
| 30 | yan99 |
| 31 | haisen900 |
| 31 | ritai67 |
| 32 | haliluya1225 |
| 33 | haozoo96 |
| 34 | hello336699 |
| 34 | hetianyuguanyin |
| 34 | putiantongqing888 |
| 34 | xiangchangjiuchang2013 |
| 35 | hongyunguangjin118 |
| 36 | hotrue |
| 37 | huanbei563 |
| 37 | shanshui885 |
| 38 | hulijing666 |
| 39 | idpads |
| 40 | iphone7c |
| 41 | jingan5678123 |
| 42 | jojoni01 |
| 42 | oof901 |
| 43 | kaixinshitou518 |
| 44 | kingwatchshop |
| 45 | lidongjun188 |
| 46 | loveme5280 |
| 47 | maomao168888 |
| 47 | pingguo5168 |
| 47 | wangzhihe5718 |
| 48 | markli13 |
| 49 | mulan79 |
| 50 | nina2014 |
| 51 | nulizhuanqian |
| 52 | profee1 |
| 53 | qingchunyixiao2136 |
| 54 | qw00123 |
| 55 | ruyi168168 |
| 56 | sarah19710322 |
| 57 | sentsent |

| 58 | shangshudezhu |
|----|---------------|
| 59 | topwatchmall |
| 60 | ukey001 |
| 61 | usa0123 |
| 62 | w5588117wangshuai |
| 63 | wanmeishop20w |
| 64 | wenwo1022 |
| 65 | wholesale168518 |
| 66 | wuwulala |
| 67 | yidinghao888 |